Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 4216 | **DATE** | 5/21/2003 |
| **CASE TITLE** | Thomas Brogan vs. Chicago School Reform Board | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Order. For the reasons stated in this memorandum opinion and order, all defendants' motions are granted and this action is dismissed in its entirety. (40-1, 43-1, 44-1, 45-1)

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | MAY 2 2 2003 date docketed | 60 |
| ✓ | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| SN | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
MAY 2 2 2003

THOMAS J. BROGAN, )
)
        Plaintiff, )
)
v. ) No. 01 C 4216
)
CHICAGO SCHOOL REFORM BOARD OF )
TRUSTEES, et al., )
)
        Defendants. )

MEMORANDUM ORDER

Thomas Brogan has sued the Chicago School Reform Board of Trustees,[1] Nettelhorst Local School Council ("Council"), Susan Kurland ("Kurland") and Mary Pat Hartung ("Hartung") under 42 U.S.C. §1983 ("Section 1983") for allegedly violating his First Amendment right to engage in speech on matters of public concern when defendants allegedly retaliated against him by subjecting him to adverse terms and conditions of employment, including harassing disciplinary measures and progressive discipline. All defendants have moved for summary judgment under Rule 56,[2] and

---

[1] Although Brogan initially named that entity as a defendant, the terms of its members expired in July 1999 and members of the new Chicago Board of Education ("Board") have been appointed in their place. Consequently the Board is now the proper party defendant (D. St. ¶3)--see Fed. R. Civ. P. ("Rule") 25(d).

[2] Although all defendants join in their factual submissions, separate motions and supporting memoranda have been filed by Board, by Council and Hartung (acting jointly) and by Kurland. Brogan has then tendered a single consolidated response, and defendants' replies have followed the same format as their original submissions. Because it was Kurland who initially imposed all of the disciplinary actions of which Brogan



the parties have complied with this District Court's LR 56.1.[3] For the reasons stated in this memorandum opinion and order, all defendants' motions are granted and this action is dismissed in its entirety.

Summary Judgment Standards

Familiar Rule 56 principles impose on defendants, as movants, the burden of establishing the lack of a genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose this Court must "consider the evidentiary record in the light most favorable to the non-moving party...and draw all reasonable inferences in his favor" (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)). And Pugh v. City of Attica, 259 F.3d 619, 625 (7th Cir. 2001) has echoed the teaching of Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986):

---

complains (although under law the Board and not Kurland was the ultimate decisionmaker), and because the same analysis that defeats Brogan's claim against Kurland also dooms his claims against all other defendants, this opinion will focus in the first instance on Brogan's position vis-a-vis Kurland.

[3] LR 56.1 is designed to facilitate the resolution of Rule 56 motions by calling for evidentiary statements and responses to such statements (in each instance with record citations), thus highlighting the existence or nonexistence of factual disputes. This opinion cites to defendants' LR 56.1(a)(3) statement as "D. St. ¶--," to Brogan's response as "B. Resp. St. ¶--," and to Brogan's LR 56.1(b)(3)(B) statement of additional facts as "B. St. ¶--." This opinion employs the same "B." and "D." abbreviations in referring to the parties' exhibits ("Ex."), and it uses "B." and "K." (for Kurland) in citing their respective memoranda ("Mem.").

A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[4]

As with any summary judgment motion, this Court accepts nonmovant Brogan's version of any disputed facts, so long as it is supported by record evidence. But because (as hereafter explained) this Court must examine the bona fides of the asserted justifications for the disciplines imposed on Brogan, and because Brogan's disputes on that score are better addressed after the disciplinary actions are described, the Background section that follows reflects defendants' perception of the situations.

### Background

Beginning in 1997 Brogan was a teacher of the Chicago Public Schools primarily assigned to Louis B. Nettelhorst Elementary School ("Nettelhorst") (D. St. ¶1). During that time Nettlehorst Principal Kurland initiated discipline against Brogan on five separate occasions. All of those suspensions were upheld by the Board, though it sometimes reduced their duration. As for the Council, under the statutory educational structure it is a public entity with no authority, duty or responsibility for disciplining

---

[4] Brogan argues that the principle outlined in Anderson, 477 U.S. at 252 should be applied with "added rigor in employment discrimination cases" (B. Mem. 2). But Alexander v. Wis. Dep't of Health & Family Servs., 263 F.3d 673, 680-81 (7th Cir. 2001) disavows that concept of "added rigor" and makes it clear that the consideration of summary judgment motions in the employment context should be undertaken with the same kind of scrutiny as in other types of cases.

teachers (D. St. ¶4). Hartung was the Council's chairperson from 1999 to 2001 (D. St. ¶5).

Brogan says that before his resignation in June 2001 he consistently raised issues and concerns during public Council meetings and Nettlehorst faculty meetings (B. Mem. 3-4). Brogan points to his voicing of concerns over (1) Nettlehorst's grouping students by ability, (2) Nettelhorst's method of administering and utilizing some types of testing of its students and (3) problems in Nettelhorst's special education program (id.). Brogan also requested Council minutes and sought to videotape the public Council meetings (B. St. ¶¶188-99), as well as inquiring into Kurland's and the Council's management of Nettlehorst finances (B. St. ¶¶200-15). According to Brogan, Kurland's initiation of the disciplinary actions described next was in retaliation for his outspokenness (B. Mem. 1).

### First Disciplinary Action[5]

On September 25, 2000 Kurland recommended a five-day suspension for Brogan, based on numerous complaints that she had received from other staff members at Nettlehorst who complained of Brogan's abusive conduct towards them (K. Mem. 3). Kurland identifies six different incidents that were reported to her as leading to the first disciplinary action.

---

[5] Because the parties have referred to a number of individuals by their last names only, this opinion must perforce mirror that usage.

First, on September 15, 1999 staff member Haney complained that Brogan intimidated her when he confronted her on the school stairs and chastised her in front of numerous students (D. St. ¶30a). Brogan argues that Haney's complaint was inaccurate, but he acknowledges that he had a difficult time with Haney and that he expressed his frustration with her (B. Resp. St. ¶30a)

Shortly thereafter two other Nettelhorst staff members, Jones and Frank, complained that Brogan offended them when he scolded them over the microphone to be quiet (D. St. ¶30b). Brogan does not dispute the factual basis, but instead points to Kurland's failure to castigate him during a meeting about the morning reading program (B. Resp. St. ¶30b).

Nettelhorst Guidance Counselor Fitzpatrick complained of Brogan's behavior toward her when Brogan spoke with her about his disagreement over a student's individual educational plan (D. St. ¶30c). Brogan claims that he was unaware of Fitzpatrick's complaint and that he did not shout or yell at her (B. Resp. St. ¶30c).

All of those first three concerns were brought to teacher's union delegate Paulette Flanagan ("Flanagan"), who later brought them to Kurland's attention (D. St. ¶30d). Kurland relied on a November 23, 1999 memorandum that summarized the complaints (K. Mem. 5). Although Flanagan denied drafting the memorandum in the form shown at her deposition (B. Ex. P at 13-16), she

5

acknowledged that she authored everything that appears in the memo except for one heading and a date (id. at 15, 16, 19, 24), and she also testified that nothing in the November 23 memorandum is inaccurate except for the date originally given as September 21, 1999 (id. at 44-45).

Flanagan's memorandum to Kurland began by stating "It has come to my attention that Mr. Brogan has again displayed unprofessional behavior toward a fellow employee," and it then recounted Brogan's behavior with Haney, Frank, Jones and Fitzpatrick (D. Ex. Flanagan Dep. at B-000125). Flanagan then went on to say, "Apparently Mr. Brogan feels that he can behave unprofessionally, bully, or intimidate, and receive no meaningful consequences," and she ended by characterizing Brogan's behavior as a "serious and flagrant violation of the teachers' right to work under a 'safe and healthful' environment" (id.).

In formulating the September 25, 2000 disciplinary action, Kurland also relied on reports about Brogan's behavior with Assistant Principal Margaret Kouretsos ("Kouretsos") as well as with a school parent and another teacher. Those three incidents are described next.

On August 21, 2000 Kouretsos complained that Brogan was disrespectful toward her and called her "rude" when Brogan insisted on finishing a private and personal conversation with another teacher before Kouretsos could speak with Brogan about a

6

question relating to school business (D. St. ¶30e). Brogan disputes whether he engaged in inappropriate behavior, but he does not deny that the interaction occurred (B. Resp. St. ¶30e).

On August 22, 2000 Kurland received a report that Brogan intimidated and harassed a parent of a student and Council member Margaret Tomaszek-Witry (D. St. ¶30f). Brogan disputes that he acted inappropriately and refers to another Council member who did not find Brogan's behavior intimidating or bizarre and unprofessional (B. Resp. St. ¶30f).

On September 12 or 13, 2000 Karen Fasso complained to Kurland that Brogan had treated her in an unprofessional and aggressive manner (D. St. ¶30g). Brogan disputes such inappropriate treatment (B. Resp. St. ¶30g).

On review the Board upheld Kurland's disciplinary recommendation based on those six incidents. It stated (D. St. ¶29):

> [Brogan's] [s]peaking to co-workers in aggressive, abrupt and condescending manner on several occasions and verbally intimidating, threatening or abusing a supervisor are behaviors that are inappropriate and seriously disrupt the orderly educational process in the school. Such behavior violates the Employee Discipline code, and warrants disciplinary action.

### Second Disciplinary Action.

Kurland states that she initiated Brogan's second disciplinary action because he was insubordinate (D. St. ¶35). Having received information from Kouretsos that Brogan had been

7

videotaping proceedings in his classroom (id. ¶38), Kurland asked him if she could review a copy of that videotape (id. ¶43) in accordance with school rules that any videotape had to be given to the principal for review (id. ¶40). After Brogan asked why she needed to see the videotape, Kurland again requested the videotape (id. ¶44). Brogan refused to comply with Kurland's request, basing his refusal on the premise that the request was unclear because Kurland had requested a videotape of his "class," while the videotape involved only several students of his class (id. ¶48).

Brogan was ultimately issued a four-day suspension on January 9, 2001 (id. ¶36), and he apologized for his behavior toward Kurland (id. ¶53). After a hearing on the matter, the Board through its Office of Labor Relations upheld the disciplinary action (id. ¶36).

### Third Disciplinary Action

Kurland says that she initiated the third disciplinary action against Brogan on March 9, 2001 when she learned that he had assigned his students a writing project to dispute a classroom observation that Kurland had made and to continue to fight the second disciplinary action about the videotape (K. Mem. 7; D. St. ¶¶55, 58). Brogan admits that he gave the assignments and further admits that he intended to use the documents to refute Kurland's observations (D. St. ¶¶59-61, 64). Another

8

basis for the disciplinary action was Brogan's use of school time to go through the hallways of the school to observe what other teachers were doing in an effort to refute Kurland's observations on his own classroom (id. ¶66). Finally, Brogan also used students to gather information about the videotape that was the basis of the second disciplinary action (id. ¶67).

### Fourth Disciplinary Action

Kurland initiated the fourth disciplinary hearing on March 23, 2001 for two reasons: Brogan refused to accept the third disciplinary notice because it contained a handwritten rather than a typed change (D. St. ¶68), and Brogan allegedly engaged in inappropriate conduct during a faculty meeting (id. ¶69). Brogan acknowledges that during the March 21 faculty meeting he discussed that he had been disciplined and stated that all faculty members should make sure that they get copies of the disciplinary code (id. ¶69). Brogan also indicated during the faculty meeting that his dispute might end up in federal court (id. ¶70). Staff members told Kurland about Brogan's comments, and several wrote letters indicating that they were highly offended by his comments (id. ¶¶71, 73).

Kurland told Brogan that it was inappropriate to spend staff time discussing his disciplinary issues (id. ¶72). Approving both the March 9 and March 23 disciplinary actions, the Director of Board's Office of Labor Relations reduced the duration of the

9

two suspensions from the recommended total of 15 days to 10 days (id. ¶75).

### Fifth Disciplinary Action

On April 9, 2001 Kurland initiated further discipline against Brogan, this time seeking a five-day suspension for inappropriate conduct and negligent supervision (D. St. ¶76). When observing Brogan's classroom on February 21, 2001, Kurland had noticed that the classroom door was locked when students were in the classroom, that Brogan had provided food to his students during class time and that he allowed a student to leave the classroom unsupervised. (id. ¶79). Brogan acknowledged taking those actions (id. ¶¶80-82), but he argues that other teachers have taken similar actions (B. Resp. St. ¶¶80, 82) or that there were valid reasons for the action (id. ¶81).

On May 21, 2001 the Director of Board's Office of Labor Relations reviewed Kurland's five-day recommendation, upholding the suspension but reducing its term to three days (D. St. ¶77). In doing so the Director stated that "repeated acts of purposeful insubordination and disruption of the school day are indeed offenses which warrant disciplinary action. The record indicates there was sufficient basis for such school-based discipline and supports a three day suspension" (id.).

### Retaliation Claim

Any First Amendment retaliation claim under Section 1983

10

calls for a three-step analysis set out in Vukadinovich v. Bd. of Sch. Trustees, 278 F. 3d 693, 699 (7th Cir. 2002)(citations omitted and adapted to this case):

> 1) Was his speech constitutionally protected? 2) If so, were the defendants' actions motivated by his constitutionally protected speech? 3) If [Brogan] can show that his constitutionally protected speech was a substantial or motivating factor in his termination, can the defendants show that they would have taken the same action in the absence of his exercise of his rights under the First Amendment? If [Brogan] can establish the first two prongs, the burden shifts to the defendants to prove by a preponderance of the evidence that [Brogan] would have been terminated regardless of his protected speech. If the defendants carry that burden, [Brogan] bears the burden of persuasion to show that the defendants' proffered reasons were pretextual and that discrimination was the real reason that the defendants fired him. In the summary judgment context, this means that [Brogan] has to show that a rational finder of fact could infer that the defendants' stated reasons for firing him were lies.

Even if it is assumed arguendo that Brogan can satisfy the first two prongs,[6] it cannot be gainsaid that defendants have met their burden on the third. And that being so, Brogan is defeated unless he can show (with the benefit of the required reasonable

---

[6] That arguendo assumption is itself questionable. As Kurland's R. Mem. 1-2 points out, Brogan has admitted (B. St. ¶¶109, 145) that he never raised any issues as to Nettlehorst's finances during the 1999-2000 school year--or indeed, until December 2000. Just how, then, could the first suspension in September 2000 (the instance on which Brogan places his principal emphasis and, in fact, the linchpin of his claim challenging the later suspensions) have been retaliatory for protected speech that had not yet taken place? All that remains, then, in the way of pre-September-2000 activity are Brogan's requests to the Council for its minutes and its budget committee minutes--matters in which Kurland had no substantive involvement.

11

favorable inferences) that the disciplinary actions were pretextual. To recapitulate that sequential analysis, the Background section reflects that the disciplinary actions were taken for a number of asserted reasons, including insubordination and intimidating behavior. Because such actions plainly come under the rubric of inappropriate behavior, the burden shifts to Brogan to show that the asserted justifications were pretextual.

On that score Vukadinovich, 278 F.2d at 699-700 (adapted to this case) further teaches that Brogan can show pretext either "directly, with evidence showing that retaliation was the most likely motive for [disciplining] him," or "indirectly, by showing that the defendants' justifications were not worthy of credence." Because Brogan is clearly unable to meet the former alternative, he must attempt to qualify under the second. And to show that defendants' justifications were not worthy of credence, Brogan "must show that 1) the defendants' justifications have no basis in fact, 2) the justifications were not the real reason for [disciplining] him, or 3) the justifications were insufficient to warrant the [discipline]" (id.).

Brogan's best chance in that respect is as to the first disciplinary actions, but that claim (like the others) fails as a matter of law. Although Brogan contends that the justification for that discipline has no basis in fact, that action stemmed from well-documented incidents that Brogan does not claim did not

12

occur--instead he offers an alternative explanation for why they occurred. Even if the asserted grounds underlying the numerous facts underlying such complaints were open to multiple interpretations or--as Brogan contends--were unfounded (something that has no support in the record other than Brogan's own self-appraisal), Kurland had no reason to suspect that the complaints were illegitimate. Kurland's receipt of numerous complaints about Brogan's allegedly intimidating and harassing behavior were more than sufficient to allow her to form an honest belief that Brogan was acting in that manner. Brogan's own subjective view that Kurland's actions were retaliatory is insufficient to create an issue of material fact (Johnson v. Univ. of Wis.-Eau Claire, 70 F.3d 469, 480 (7th Cir. 1995)). As long as an employer's reasons were honestly held, such reasons can even be "mistaken, ill considered or foolish" (Jordan v. Summers, 205 F.3d 337, 343 (7th Cir. 2000)).[7]

Brogan also fails in any effort to show that the stated justifications were not the real reasons for disciplining him. Brogan claims that the first suspension occurred only a month after his request for Council minutes and his allusions to

---

[7] What has just been said in the text should not be misunderstood as even suggesting anything of the sort. To the contrary, nothing in the record can support any such pejorative characterization. Instead the point is that Brogan would not prevail even if the reasons for imposing discipline had been that questionable--as they were not.

13

Kurland's mismanagement of Nettelhorst finances. Similarly he urges that the timing of the suspension, combined with Kurland's reliance on Haney's nearly year-old complaint, "strains credibility [sic--presumably "credulity" is what his counsel means]" to such an extent as to show pretext (B. Mem. 5). But Pugh, 259 F.3d at 628-29 teaches that just the timing of the adverse employer action, without more, is insufficient to establish the protected activity as a motivating factor. And Brogan has provided nothing more.[8]

Brogan next claims that Kurland's reliance on the Flanagan memorandum is further proof of defendants' pretextual actions. Brogan refers to the Flanagan memorandum as "fabricated" and that "the evidence suggests that Dr. Kurland did not receive the complaints" (B. Mem. 8). Not so. First, Brogan's contention that the Flanagan memorandum is fabricated is not worthy of discussion, given Flanagan's acknowledgment of the accuracy of the contents (B. Ex. P at 44-45). Nor does Brogan's mention that Kurland failed to reprimand him in any way undercut the evidence of the numerous complaints that Kurland received.

Brogan also seeks to characterize Kurland's stated intention that "she wanted Brogan out of the building" (B. St. ¶¶ 282-87,

---

[8] Moreover, there is nothing inappropriate about a supervisor's not initiating disciplinary charges until the repetition of improper behavior appears to justify such action, then including the earlier instances as part of the charges.

14

314) as purportedly evidencing the pretextual nature of the proffered reasons for any disciplinary action. But that is a nonsequitur: Any such statement does nothing to indicate that Kurland wanted Brogan out of the building for retaliatory reasons, rather than because she believed (with so many complaints having been lodged against him) that he was disruptive to the school's operations.

Finally, it cannot be said that Kurland's stated justifications were insufficient to warrant the discipline that was ultimately applied. In light of Brogan's repeated misconduct, the modest suspensions imposed were a minimalist response on the part of Kurland--and ultimately, of the Board.

In sum, Brogan fails utterly in his effort to show that the reasons for the first disciplinary action were pretextual, so that his claim against Kurland based on that action fails as a matter of law. And Brogan's claims based on the later disciplinary actions not only rely heavily on the purportedly (but not actually) pretextual nature of the first but also have even less substantive support than the first failed attempt. Thus any claims against Kurland relating to those disciplinary actions also fail.

### Constructive Discharge

Brogan also attempts to support his retaliation claim by urging that he was constructively discharged. To prove a claim

15

of constructive discharge, an employee must demonstrate that he or she was forced to resign because of what a reasonable employee would have considered unbearable working conditions (Lindale v. Tokheim Corp., 145 F.3d 953, 955 (7th Cir. 1998)). But that hill is a very steep one to surmount (see, e.g., Johnson v. Nordstrom, Inc., 260 F.3d 727, 735 (7th Cir. 2001)), and Brogan's short-term suspensions for insubordination do not even begin to approach that level. Moreover, Brogan admits that his teaching position did not interfere with the exercise of free speech, nor did he believe that his ability to teach was impaired (D. St. ¶173 and B. Resp. St. ¶173).

## Other Defendants

What has been said to this point compels the granting of summary judgment in Kurland's favor in all respects. And that same conclusion applies a fortiori to the other defendants: Not only does Brogan's total failure on the retaliation front operate to defeat any such claims against them as well, but they also have other strings to their bows that independently support the same outcome.[9]

## Conclusion

There is no genuine issue of material fact, and all defendants are entitled to judgment as a mater of law. Their

---

[9] Under the circumstances, there is no need to lengthen this opinion further by addressing those added matters. By definition, one fatal blow is enough.

16

motions for summary judgment are granted, and Brogan's claims and this action are dismissed in their entirety.

_____
Milton I. Shadur
Senior United States District Judge

Date: May 21, 2003